UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
EDWARD C. CHAMPAGNE, JR., d/b/a
H.E. Automotive,

                        Plaintiff,

v.                                       8:13-cv-571


UNITED STATES OF AMERICA,

                         Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
THOMAS J. McAVOY
Senior United States Judge

## DECISION and ORDER

Plaintiff Edward C. Champagne, Jr., d/b/a H.E. Automotive, commenced the instant action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2674, 1346(b), *et seq.*, alleging that Defendant tortiously interfered with a contract, breached its duty of good faith and fair dealing with the Plaintiff, acted to destroy his business, and failed to correct past performance ratings, causing Plaintiff and his business substantial harm. Presently before the Court is Defendant's motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## I.    FACTS[1]

This case involves work done by H.E. Automotive, Plaintiff's business, to process and handle seized vehicles for the United States Marshals Service ("USMS"). H.E. Automotive was awarded contract number MS-97-D-0019 by the USMS on or about April 25, 1997. Complaint ("Cmplt.") Dkt. #1, at ¶ 9. Plaintiff's company was awarded

---

[1]The facts in this section are taken from Plaintiff's Complaint.

the contract despite being forced to disprove false and slanderous allegations against Plaintiff by the former incumbent contractor, who was hoping to maintain the contract. Id. at ¶ 10.  The former contractor was working with the assistance of a friend, an Assistant District Marshal, who provided false information about Plaintiff to the USMS in Washington, D.C.  Id.  Plaintiff and his firm disproved these claims by filing protests and appeals with the Small Business Administration, and Plaintiff's firm received the contract.  Id. at ¶ 11.  As a precondition of the contract, H.E. Automotive received a guarantee that no one involved in the then-current administration would be involved in the contract.  Id. at ¶ 12.

H.E. Automotive performed under this contract for a number of years, and obtained a number of successive contracts.  Id. at ¶ 13.  While performing under the contract, H.E. instituted a number of new policies that assisted the Marshals Service and taxpayers, such as opening seized asset sales to the public and implementing new maintenance programs that increased the value of government vehicles sold.  Id. at ¶ 14.  Plaintiff recovered $140,000 in cash from a vehicle scheduled for auction and also prevented efforts of two persons to steal the vehicle by breaking into the H.E. facility. Id. at ¶ 15.  H.E. also alerted the F.B.I, which led to a search of H.E.'s facility and the recovery of illegal drugs worth hundreds of thousands of dollars.  Id. at ¶ 16.   Because of these efforts, H.E. received an average rating of 4.5 on a five-point scale during the lives of H.E's contracts with the Marshals Service.  Id. at ¶ 17.

Under the terms of the contract, H.E. Automotive was to receive a minimum of 30% of all vehicles seized within the geographic area designated in the contract.  Id. at ¶ 18.  Despite these terms, during the life of the contract Anne Deminski, who worked in

the Utica/Syracuse District Office, "intentionally interfered with H.E. Automotive's contract by circumventing the existing contract," and by "withholding sums owed under the contracts [sic] specified guaranteed minimum quantity charge." Id. at ¶ 19. Deminiski also convinced personnel in the Washington Contract Office to refuse renewal of the contract option unless the contract eliminated minimum guarantees. Id. at ¶ 20.

When Plaintiff inquired about why fewer cars were being sent to his facility, he discovered that hundreds of vehicles were being diverted to various agencies and non-contract vendors. Id. at ¶¶ 21-22. These "diversions" came at the direction of Anne Deminski. Id. at ¶ 22. Deminski was the only remaining employee from the administrator of the former Contractor and Assistant Chief. Id. at ¶ 23. Plaintiff alleges that Deminski worked "actively" to "[circumvent] the contract" and to "[deprive] H.E. of guaranteed stated minimums." Id. at ¶ 24. She also acted to divert vehicles to other "entities," who did not care for the vehicles properly and cost the government money. Id. Some of those "diverted" vehicles actually disappeared. Id. Plaintiff alleges that, when confronted by Contracting Officer Gary Insley, Deminski retaliated against Plaintiff and Plaintiff's company by refusing to pay Plaintiff more than $150,000, the minimum amount he was owed under the contract. Id. at ¶ 25.

Plaintiff also alleges that Deminski had the contract location moved from Plattsburgh to Syracuse. Id. at ¶ 26. When a new procument was then let, H.E. emerged as the successful bidder. Id. at ¶ 27. H.E. leased an approved facility in Brewerton, New York and operated that facility with "record setting sales." Id. Still, Deminski allegedly interfered with the operations of this facility too; at times there were

less than 5 cars in H.E.'s inventory.  Id. at ¶ 28.  She also allegedly arranged to replace

certain administrative personnel with personnel of her choosing.  Id. at ¶ 29.  These

new officers worked with Deminski to "discredit H.E. Automotive through excessive

inspections and fabricated reports about H.E.'s performance under the contract."  Id.

On two separate occasions Deminski allegedly had all vehicles moved to a contractor

she chose, CNY NY, even though the Marshals Service was still under contract with

H.E. Automotive.  Id. at ¶ 30.  After a protest, the vehicles were eventually returned to

H.E.  Id. at ¶ 31.  These actions cost the Marshals Service in excess of $10,000.  Id.

On April 6, 2010, H.E. Automotive submitted an offer under RFQ number DJMS-

09-AFD-Q-0054.  Id. at ¶ 32.  Plaintiff alleges that only two quotations were submitted

under that number, H.E. Automotive's and one from a Baldwinsville, New York firm

known as Simply the Best.  Id. at ¶ 33.  Simply the Best quoted a price with options of

$617,544.50.  Id.  The company had been newly created for the purpose of submitting

an offer, and worked out of a garage.  Id. at ¶ 34.

H.E. Automotive first learned of negative past performance ratings on February

1, 2010, during the evaluation process for this new procurement.  Id. at ¶ 35.  Those

negative past performance ratings came, however, during the October 2007-October

2008 contract period, and the evaluations were performed by Anne Deminski and

Daniel Driscoll.  Id.  Plaintiff had long complained that Deminski had a personal animus

towards him, and that she had interfered with performance of the prior contract.  Id. at ¶

36.  He had also alleged that Deminski had attempted to steer an earlier procurement

towards a competitor, CNY.  Id.  H.E. Automotive protested Deminski's involvement in

the DJMS-09-AFD-Q-0054 procurement process, requesting that the Government

4

Accountability Office ("GAO") exclude her from any role in the procurement.  Id. at ¶ 37. The GAO had earlier agreed with Plaintiff's claims of animus against Deminski, and the Marshals Service had precluded her from participating in the process of awarding an interim contract.  Id. at ¶ 38.  Despite this preclusion, Plaintiff alleges that Deminski "played an integral role" in evaluating H.E. Automotive and, acting contrary to instructions from her superiors, worked to "circumvent a then existing contract" by directing that seized vehicles be sent to "non-contract vendors and agencies of her choosing."  Id. at ¶ 39.

H.E. Automotive's last contract with Defendant came in 2007 and 2008.  Id. at ¶ 40.  The government had an option to continue the contract.  Id. at ¶ 41.  An attorney for H.E. Automotive wrote the government's contracting officer on September 28, 2008 to request that the option be exercised.  Id.  The letter noted that H.E.' s record was excellent, and also pointed out that a decision not to exercise the option that was made in bad faith could be protested.  Id. at ¶ 42.  The letter also detailed Deminski's actions, as well of those of other officials, alleging that those actions were taken in bad faith and breached the contract.  Id. at ¶ 43.

The agency decided not to exercise the option and the contract terminated on October 24, 2008.  Id. at ¶ 44.  The USMS unilaterally determined to issue purchase orders, and did not invite H.E. Automotive to participate.  Id.  H.E. Automotive filed a protest on October 20, 2008, alleging that Deminski violated the Competition in Contracting Act by initiating a new procurement without seeking input from the incumbent contractor.  Id.  This protest was amended after the Northern District of New York issued a formal solicitation of bids.  Id. at ¶ 45.  The protest was also resolved

when the USMS returned vehicles which had been improperly removed from H.E. Automotive's facility and paid H.E. the cost of returning the vehicles.  Id. at ¶ 46.  The protest continued however, since H.E. alleged that the contracting process had been marred by conflict of interest, bias and improprieties.  Id. at ¶ 47.  The protest specifically alleged that Deminski acted improperly in the interest of CNY and had provided CNY with information on the bid process.  Id. at ¶¶ 48-9.  H.E. Automotive sought preclusion of Anne Deminski from the process of evaluating bids and a review of any inside information that CNY allegedly received.  Id. at ¶ 49.  H.E. also sought removal of CNY from the bid process if it had received improper information.  Id.  A GAO attorney promised to review the allegations in H.E.'s protest and issue a report by December 10, 2008.  Id. at ¶ 50.  After the USMS cancelled the solicitation the GAO dismissed the protest as moot.  Id. at ¶¶ 51-52.

The USMS issued another solicitation on December 18, 2008.  Id. at ¶ 52.  Bids were due by December 31, 2008.  Id.  H.E. Automotive contacted the contracting officer for information on the bid, as well as to determine the role that Anne Deminski would play in the bid process.  Id. at ¶ 53.  H.E. sought to exclude her from the bid.  Id. at ¶ 54.  The agency did not offer a timely response, and H.E. Automotive filed another protest, again seeking Deminski's removal from the evaluation process.  Id.  H.E. asserted that Deminski's "demonstrated" bias should preclude her from evaluating bids. Id.  After examining the protest, the agency issued an amended solicitation that answered several of the questions in the protest.  Id. at ¶ 55.  Several issues remained open, however, including the wage rates that the bidder was required to pay and the identity of the Contracting Offices Technical Representative ("COTR").  Id.   The USMS

requested dismissal of the protest, claiming that minimum guarantees were not required under the contracting procedure, that the COTR need not be identified, and that Deminski would not evaluate the bid.  Id. at ¶ 57.  Plaintiff's attorney responded by letter to these assertions, contending that minimum guarantees and reliable estimates of vehicle quantities were necessary, as was further supervision of Deminski.  Id. at ¶¶ 58-59.

While this protest was pending, Plaintiff alleges, he had difficulties administering the automobiles still on his lot.  Id. at ¶ 56.  These difficulties arose because Deminski, acting as a COTR even though she was not assigned that role, issued orders that confused the process.  Id. at ¶ 56.  When Plaintiff sought assistance from the contracting officer, Gary Insley, Mr. Insley informed him that "'You do not have a contract in place with HQ.  I don't know what arrangements you have in place.  I cannot help you with that.'" Id.

On or about March 26, 2009, counsel for Plaintiff, the USMS and the GAO held a conference call.  Id. at ¶ 59.  The GAO attorney concluded that there was insufficient evidence to demonstrate bad faith at that time with respect to Deminski's actions.  Id. In any case, the issue was moot because Deminski would not be involved in the procurement process.  The GAO attorney also concluded that there no minimum guarantee required under the contracting process.  Id.  Still, the USMS issued an amendment to the procurement establishing a guaranteed minimum and the protest was dismissed as moot.  Id.

H.E. Automotive succeeded in its bid on the contract.  Id. at ¶ 60.  The contract was extended by modification.  Id. Plaintiff acceded to this modification at the specific

request of the USMS and the contracting officer.  Id. at ¶ 61.  The agency then solicited

another contract that was to last significantly longer than the interim contract.  Id. at ¶

62.  The USMS's contracting officer notified H.E. Automotive that the solicitation would

be publicly advertised and was set aside for 100 percent small business.  Id.  On

August 29, 2009, the agency announced that bids would be due September 10, 2009.

Id. at ¶ 63.

On September 29, 2009, the contracting officer e-mailed Plaintiff to inform him

that the USMS would not be able to award a contract by September 30, 2009.  Id.  The

officer requested a purchase order to continue storing vehicles through October 2009.

Id.  Plaintiff did not want to accept the extension of the interim agreement because of

the volume of vehicles stored and the costs for storing them.  Id.  Plaintiff actually lost

money on the agreement, but agreed to do so as an accommodation to the USMS's

urgent needs.  Id.  The parties also agreed that payment would come from

headquarters, not the district office.  Id.  Moreover, no inspection of the facility could be

undertaken without permission from the contracting officer.  Id.

Plaintiff submitted the bid as required on October 19, 2009.  Id. at ¶ 65.  He was

informed shortly thereafter that his bid was "in the competitive range," but officials

required that he address seven specific discussion questions within a few days.  Id.

Those discussion questions arose out of past performance ratings.  Id.  As he prepared

to give a presentation on his bid, Plaintiff had repeatedly requested from the contracting

officer any and all inspection or quarterly performance evaluations from prior years.  Id.

at ¶ 64.  Plaintiff was entitled to receive such reports and had not done so.  Id.  Despite

this request, Plaintiff only learned of past alleged deficiencies in his performance when

he was requested to submit a response to past critical evaluations on January 19, 2010. Id.  These critical evaluations had been completed by Defendant on January 10, 2010, even though they referenced alleged deficiencies from 2007-2008.  Id.  Plaintiff responded to the allegations on February 1, 2010.  Id.

On or about April 6, 2010, Plaintiff received notice by e-mail that he did not receive the award, which went to Simply the Best-Storage.  Id. at ¶ 67.  H.E. Automotive immediately requested a debriefing and was informed that the USMS would provide a written debriefing.  Id.  The USMS provided this debriefing on April 12, 2010.  Id. at ¶ 68.  The debriefing stated that Simply the Best, which had no prior past performance, had received a neutral rating and was viewed as satisfactory.  Id.  H.E. Automotive, by contrast, received a marginal/satisfactory rating.  Id.  According to the debriefing, Plaintiff's higher price was the determining factor in the award going to Simply the Best. Id.  Plaintiff alleged, however, that the ratings of marginal/satisfactory for H.E. were not supported by the record.  Id. at ¶ 69.  Had H.E. received the proper rating the contract would have gone to H.E.  Id.  Plaintiff alleges that the poor performance ratings by Deminski and Driscoll "were part of a conspiracy" to prevent H.E. Automotive from receiving the contract.  Id. at ¶ 71.  The parties engaged in Alternative Dispute Resolution.  Id. at ¶ 72.  Despite a GAO recommendation that the past performance evaluation be redone, no concrete actions occurred.  Id.

Plaintiff filed a protest on April 22, 2010.  Id. at ¶ 96.  Plaintiff alleges that the USMS, despite promises that corrective action would be taken made in July 2010, did nothing to correct the process that had led to the award of the contract to Simply the Best.  Id. at ¶ 74.  Plaintiff alleges that Defendant, through the GAO, made a concrete

promise to review past evaluations, terminate the contract with Simply the Best, and reevaluate the award.  Id. at ¶ 75.  Multiple contracting officers asked Plaintiff to remain patient and keep facilities ready to receive vehicles and had suggested opening negotiations on a new contract, but these officers took no steps to actually arrange for a contract with Plaintiff.  Id. at ¶¶ 74; 77-95.  After waiting nine months with no response, Plaintiff filed another protest on April 4, 2011.  Id. at ¶ 74, 96.  It was only on this date that Plaintiff was contacted for a "follow up solicitation."  Id. at ¶ 96.

Plaintiff filed a four-count complaint based on this conduct in this Court on May 16, 2013.  Count one alleges tortious interference with a contract.  Count Two alleges a violation of Defendant's duty of good faith in awarding a contract.  Count Three alleges that Defendant's actions "constitute a Destruction of a Business."  Count Four raises a claim for Defendant's failure to correct past performance ratings.  As damages, Plaintiff seeks $1,260,000.

Defendant responded to the Complaint by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12.  The parties have briefed the issues, bringing the case to its present posture.

## II.    LEGAL STANDARD

Defendant moves to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).   Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move to dismiss the complaint for "lack of subject matter jurisdiction." FED. R. CIV. P. 12(b)(1).  "When . . . a jurisdictional challenge under Fed. R. Civ. P. 12(b)(1) is addressed to the complaint, a court accepts as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff."

Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003).  Under Rule 12(b)(1),

"[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove

no set of facts which would entitle him or her to relief."  Raila v. United States, 355 F.3d

118, 119 (2d Cir. 2004).  If a party moves for dismissal based on lack of subject matter

jurisdiction as well as on other grounds, "'the court should consider the Rule 12(b)(1)

challenge first since if it must dismiss the complaint for lack of subject matter

jurisdiction, the accompanying defenses and objections become moot and do not need

to be determined.'"  Rhulen Agency, Inc. v. Alabama Ins. Guaranty Ass'n, 896 F.2d

674, 678 (2d Cir. 1990) (quoting 5 C. Wright and A. Miller, FEDERAL PRACTICE AND

PROCEDURE, § 1350, p. 148 (1969)).

The Defendant also moves to dismiss Plaintiff's complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).  Defendant argues that Plaintiff has not stated a claim

upon which relief could be granted, even if all factual allegations in the complaint were

proved true.  In addressing such motions, the Court must accept "all factual allegations

in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."

Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to

legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."

Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

### III.    ANALYSIS

### A. Subject Matter Jurisdiction

Defendant intially argues that the Court lacks subject matter jurisdiction to hear Plaintiff's claims. First, Defendant argues that the Contracts Disputes Act ("CDA"), 41 U.S.C. § 7101, et seq., specifically vests jurisdiction for the types of contract claims that are the subject of this action in the Court of Federal Claims, not the district courts. Second, Defendant argues, Plaintiff's claims, which are characterized as tort claims, are actually grounded in contract. The Federal Tort Claims Act, 28 U.S.C. § 2680, et seq., which waives sovereign immunity for certain tort claims, specifically excepts tort claims grounded in contract from this waiver. Plaintiff denies that the Contract Disputes Act applies to this matter because the case concerns tortious conduct surrounding Defendant's failure to award a contract and attempt to deprive Plaintiff of his livelihood, rather than a protest about the handling of a bid for a contract. Plaintiff does not address whether the contract exception to the Tort Claims Act applies to this case, and instead argues that the exception to waiver of immunity for discretionary acts of a federal employee precludes dismissal.

As a preliminary matter, this case involves the question of whether the United States, the Defendant in this action, has waived sovereign immunity. "'Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.'" <u>Dept. of the Army v. Blue Fox</u>, 525 U.S. 255, 260 (1999) (quoting <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994)). Thus, Plaintiff must show that his lawsuit invokes one of the areas where Congress has waived sovereign immunity or his action against the United States is precluded. The parties dispute whether either of two sources of waiver apply to provide this Court jurisdiction. The Court will address each in turn.

i.    **Contract Disputes Act**

One possible source of waiver of sovereign immunity comes in the Contract

Disputes Act ("CDA").   See, e.g., Pollock v. Ridge, 310 F.Supp.2d 519, 528 (W.D.N.Y.

2004) (finding that the Contract Dispute Act waives immunity for contract claims, but

limits jurisdiction to certain federal courts).  That Act establishes procedures for

disposing of disputes over "any express or implied contract . . . made by an executive

agency for the disposal of personal property."  41 U.S.C. § 7102(a)(4).  As a general

matter, "[t]he CDA waives sovereign immunity for contract disputes with the government

and gives the Court of Federal Claims jurisdiction over such actions."  Up State Federal

Credit Union v. Walker, 198 F.3d 372, 374 (2d Cir. 1999).   The Second Circuit Court of

Appeals recently concluded that "[i]n conferring original jurisdiction on federal district

courts to hear civil claims against the United States, Congress expressly excluded 'any

civil action or claim against the United States founded upon any express or implied

contract with the United States' that is subject to review under the" CDA.  M.E.S., Inc. v.

Snell, 712 F.3d 666, 672 (2d Cir. 2013) (quoting 28 U.S.C. § 1346(a)(2)[2]).  The statute

"provides for persons aggrieved in connection with such contracts to submit '[e]ach

claim . . . against the Federal Government' to a contracting officer."  Id. (quoting 41

U.S.C. § 7103(a)(1-2)).  The decisions made by this contracting officer are "'final and

--------------------

[2]This statute, which defines the terms under which a Federal District Court has jurisdiction over claims against the United States, is known as the "Tucker Act."  See, e.g., Up State Fed. Credit Union v. Walker, 198 F.3d 372, 373 (2d Cir. 1999).  The statute specifically confines jurisdiction to the Court of Claims for "any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41."  28 U.S.C. § 1346(a)(2).

conclusive'" and "'not subject to review in any forum, tribunal, or Federal Government agency,' except as authorized by the CDA itself." Id. (quoting 28 U.S.C. § 7103(g)).

Under the circumstances here, a contractor dissatisfied with the contracting officer's decision may "'bring an action directly on the claim in the United States Court of Federal Claims.'" Id. (quoting 28 U.S.C. § 7104(b)(1)). A further appeal may be taken to the United States Court of Appeals for the Federal Circuit. Id. (citing 28 U.S.C. 7107(a)(1)(A)). The CDA thus provides a "remedial scheme" that "'purports to provide final and exclusive resolution of disputes arising from government contracts' that fall within its ambit." Id. (quoting A & S Council Oil Co. v. Lader, 56 F.3d 234, 251 (D.C. Cir. 1995)). The purpose of this scheme that restricts contractual disputes to these particular bodies "is to confine these government contract disputes to expert tribunals created expressly for that purpose." United States v. Suntip Co., 82 F.3d 1468, 1474 (9th Cir. 1996). Thus, if the Plaintiff's claim is "'founded upon an[] express or implied contract with the United States[,] . . . then the CDA limits adjudication of this dispute to the Claims Court." Ingersoll-Rand Co. v. United States, 780 F.2d 74, 76 (D.C. Cir. 1985) (quoting 28 U.S.C. § 1346(a)(2)).

Defendant asserts that Plaintiff's claims related to the contracting process can be raised only under the CDA, and that this Court therefore lacks subject matter jurisdiction over those claims. Defendant necessarily concedes that Congress waived sovereign immunity for such contract claims covered by the CDA, but insists that only the Federal Court of Claims has jurisdiction under that Act. Plaintiff does not dispute that if the CDA applied this Court would lack jurisdiction over such claims. Plaintiff instead insists that the CDA does not apply because the claims here do not concern the types of "bid

14

protests" contemplated in the CDA, but are instead tort claims.

As an initial matter, Plaintiff appears to argue that none of its claims relate to decisions about awarding contracts or handling the bid process. In that sense, Plaintiff admits that the Court lacks jurisdiction to hear any claims related to the issues raised in the bid protests described in Plaintiff's Complaint and instead argues that none of the claims in the Complaint are related to those issues. The Court agrees that any claims related to how the government processed the bids, evaluated the proposals in those bids, and determined to whom to award the contract implicate claims under the CDA and such claims are not justiciable in this Court. To the extent that Plaintiff's allegations concern the bid process, those allegations are irrelevant to any claims that Plaintiff could bring in this Court. As detailed above, the allegations in paragraphs 32-96 of the Plaintiff's Complaint all address the bid process, rather than any independent causes of action. As the Plaintiff acknowledges[3], claims based on those allegations about the bid process cannot give rise to jurisdiction in this Court.

Still, Plaintiff insists that the issues in this case have to do with efforts by United States officials to interfere with H.E. Automotive's performance of the contracts and to prevent H.E. Automotive from obtaining future contracts, destroying H.E.'s business. Plaintiff therefore argues that this case concerns tort claims, and is not a contract

---

[3]Plaintiff's brief states, "Plaintiff cited as background relevant factual events of the plaintiff, for historical purposes, which did involve bid protests challenges to the award for failure or non-award to the plaintiff, but no claim for damages arising from a failure to award a contract was submitted by the plaintiff, since as explained, those forums do not have the ability to award monetary damages in such instances." Plaintiff's Brief in Opposition, Dkt. #19, at 6. The Court reads these comments as an admission that facts about the bid process are not relevant to any tort claims.

action. Plaintiff does not, however, even attempt to analyze the actual claims in any detail and explain how they sound in tort, rather than contract.  Instead, Plaintiff offers a recitation of various principles surrounding the CDA, few of which have any application to this matter.  Plaintiff has therefore failed to offer much argument as to why the claims raised are tort claims.

The question to be answered for determining this Court's jurisdiction is whether Plaintiff's claims "'[arise] out of a contract,'" which would mean that "the Court of Claims has exclusive jurisdiction over the action."  Up State, 198 F.3d at 375; see also, Chekroun v. SBA, 32 F.Supp.2d 514, 515 (D. Conn. 1998) (court lacked jurisdiction because "[c]ontract disputes with the Government are governed by the Tucker Act, which requires dismissal or transfer" when amount in dispute exceeds $10,000).   To answer this question of whether the claims in a case are contractual, the Court is to examine "'the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought[.]'" Id. (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)).  If the right that the plaintiff seeks to vindicate "stems from no independent, non-contractual source," and the remedy for violating that right is a "contractual remedy," then the claim arises out of a contract and is subject to the CDA.  Id.

Plaintiff certainly attempted to cast its claims as tort claims.  Count One is a claim for tortious interference with a contract.  Count Two is claim for violation of the government's duty of good faith in awarding a contract.  Count Three alleges that "Defendant's actions constitute a Destruction of A Business."  Count Four asserts a claim for "Defendant's Failure to Correct Past Performance Ratings."  Each of the claims seeks damages of $1,260,000.  As a general matter, the Court finds, assuming

16

all claims to be true and resolving all inferences in the Plaintiff's favor, that all of

Plaintiff's claims are grounded in a contractual dispute with a government agency. This

Court therefore lacks jurisdiction. Still, the Court will address each of the claims to

explain why jurisdiction is not available in this forum. For reasons that will become

apparent, the Court will address the first claim last.

Count Two claims that the government violated its duty of good faith in awarding

contracts. Plaintiff contends that "Defendant's actions constitute a violation of

Defendant's duty of good faith in awarding a Contract and failing to properly award a

contract to plaintiff." Complt. at ¶ 113. Plaintiff could be attempting to raise a claim for

Defendant's breach of its duties of good faith and fair dealing. "'The elements of a

claim for breach of the duty of good faith and fair dealing are practically identical to the

elements of a negligence claim:' (1) defendant must owe plaintiff a duty to act in good

faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach

of duty must proximately cause plaintiff's damages." Washington v. Kellwood Co., No

05 Civ. 10034 (DAB), 2009 U.S. Dist. LEXIS 32565, at *17-18 (S.D.N.Y. Mar. 24, 2009)

(quoting Boyd v. University of Illinois, 2001 U.S. Dist. LEXIS 2515, 2001 WL 246402, *

10 (S.D.N.Y. 2001)). New York law "'does not recognize a separate cause of action for

breach of the implied covenant of good faith and fair dealing when it is based on the

same facts as the breach of contract claim[.]'" Id. at *18 (quoting Goldblatt v. Englander

Communications, LLC, 2007 U.S. Dist. LEXIS 4278, 2007 WL 148699, *5 (S.D.N.Y.

2007)). To prevail on a bad faith claim outside the context of the contract, the plaintiff

must show "a legal duty separate and apart from contractual duties," and a plaintiff can

survive a motion to dismiss only when the bad-faith claim "'is based on allegations

different from those underlying the accompanying breach of contract claim.'" Id.
(quoting Siradas v. Chase Lincoln First Bank, N.A., 1999 U.S. Dist. LEXIS 15593, 1999
WL 787658, at *6 (S.D.N.Y. 1999)).[4]

Here, Plaintiff has not alleged any facts which would establish a duty for the
government separate and distinct from Plaintiff's allegations that the government and
government officials failed to fulfill their obligations under the contract.  Plaintiff clearly
admits that any claims related to the bidding process and the protests arising from the
bid are not justiciable in this Court, and thus the only facts relevant to Plaintiff's claim
here are facts unrelated to the actual bid process.  Those facts allege, for instance, that
during the life of the contract, Deminski "intentionally interfered with H.E. Automotive's
contract by circumventing the existing contract," and by "withholding sums owed under
the contracts [sic] specified guaranteed minimum quantity charge."  Complt. at ¶ 19.
Deminiski also convinced personnel in the Washington Contract Office to refuse
renewal of the contract option unless the contract eliminated minimum guarantees.  Id.

_____

[4]Plaintiff's Complaint cites to a number of cases to establish a standard for bad
faith in government contracting.  These cases do not establish that a separate tort
exists for bad faith that permits the Court to exercise jurisdiction over such claims.
Indeed, the cases are from the Federal Court of Claims and address the standards by
which a plaintiff can prove that the government acted in bad faith in negotiating,
administrating, or terminating a contract.  They do not address any sort of tort claim
outside the context of the contract which would give rise to a cause of action under the
Federal Tort Claims Act.  Indeed, the cases come from the very Court that Plaintiff
insists lacks jurisdiction over such causes of action.  See, e.g., Libertatia Assocs., Inc.
v. United States, 46 Fed Cl. 702, 707 (Fed. Cl. 2000) (determining that a showing of
bad faith in terminating a contract requires a showing of "'some specific intent to injure'
plaintiff by the government or" evidence that "the government was 'actuated by animus
toward the plaintiff[.]'") (quoting Kalvar Corp. v. United States, 543 F.2d 1298, 1302
(U.S. Ct Claims 1976)); Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. 38, 43
(Fed. Cl. 2004) (same).

at ¶ 20.  She diverted vehicles from which H.E.'s revenues were supposed to come under the contract to various agencies and non-contract vendors and undermined the minimums guaranteed to H.E. under the contract.  Id. at ¶¶ 21-22, 24.  At one point, Deminski refused to pay Plaintiff more than $150,000, the minimum amount he was owed under the contract.  Id. at ¶ 25.  Plaintiff likewise alleges that Deminiski interfered with H.E.'s attempts to obtain and perform under the next contract, and ignored the contract and sent vehicles to other vendors.  Id. at ¶¶ 25-28, 30.  She also allegedly arranged to replace certain administrative personnel with personnel of her choosing.  Id. at ¶ 29.  Deminski also allegedly fabricated reports about Plaintiff's performance under the contract.  Id. at ¶ 30.  Later, as bid protests were going forward, Deminski allegedly worked to undermine operation of Plaintiff's business.  Id. at ¶ 56.

The Court finds that none of the facts alleged here implicate any duty outside of the contractual relationship between the government and the Plaintiff.  Plaintiff's allegations are that Defendant, through Deminski, interfered with Plaintiff's performance under the contract, failed to pay sums due under the contract, and acted to undermine performance ratings required by the contract and which could be used to determine whether Plaintiff could bid successfully on a new contract.  None of the duties implicated by these actions exist outside of the requirements of the contract between the parties, and therefore no claim for bad faith can be founded independent of the contractual duties.  Moreover, the damages that Plaintiff seeks are damages that could only come as a result of lost payments under the contract.  As such, the right that Plaintiff seeks to vindicate "stems from no independent, non-contractual source," and the remedy for violating that right is a "contractual remedy."  Up State, 198 F.3d at 375.

The claim therefore arises out of a contract and is subject to the CDA. The motion is granted with respect to this claim.

Count Three alleges that "Defendant's actions constitute a Destruction of a Business." Complt. at ¶ 115. This ill-defined claim similarly does not give rise to a tort action independent of a contract action. To prove that Defendant somehow caused the destruction of Plaintiff's business, Plaintiff would have to show that Defendant had an obligation to provide the funds to support that business, and that failing to do so caused the Plaintiff's business to disappear. To the extent that such a claim could even be cast as a tort, proof of damages would have to include proving the existence of a contractual relationship and the rupturing of that relationship. As such, the right that Plaintiff seeks to vindicate with this claim is a right founded on the contract. The remedy for this action would involving payment of the funds owed under a contract. There is no tort action independent of a contract action on this claim, and the motion must be granted with respect to this portion of the Complaint as well.

Count Four alleges that "[b]ased on Defendant's failure to correct past performance ratings or to provide Plaintiff with corrected Past Performance ratings, and based on the foregoing, Plaintiff has sustained damages in the amount of $1,260,000." Complt. at ¶ 117. This claim is a contract claim masquerading as a tort claim, and not very well at that. To prevail on this claim would require an examination of the past-performance ratings required by the contract between the parties. The claim is thus grounded in the contract. The remedy is as well, since the remedy would be based on performance under the contract. This claim must be dismissed too.

Finally, Count One alleges that "Defendant tortiously interfered with Plaintiff's

contract and based on the foregoing, Plaintiff has sustained damages in the amount of $1,260,000.00." Complt. at ¶ 111. As with the other claims, this claim arises out of the obligations in the contract. The interference with the contract, as explained above, came in the way that Deminski refused to abide by the obligations in the contract, both in terms of paying for services and providing automobiles to the Plaintiff. Defendant also injured Plaintiff by allegedly providing false evaluations that undermined Plaintiff's ability to participate in bidding for future contracts. All of these alleged misdeeds arise out of the obligations under the contract, and the remedy for them would come through the contract's obligations and expectations. The claim, therefore, originates in the contract and this Court lacks jurisdiction to entertain the action.

In any case, even if this claim were not fundamentally grounded in the contract, there could be no basis for a tortious interference with a contract claim. Plaintiff alleges that the contract that Defendant interfered with was a contract between the Plaintiff and the Defendant. Plaintiff cannot state a claim in this respect. In New York, "'to sustain a claim for tortious interference with a contract, it must be established that a valid contract existed which a third party knew about, the third party intentionally and improperly procured the breach of the contract and the breach resulted in damage to the plaintiff.'" Ullmannglass v. Oneida, Ltd., 86 A.D.3d 827, 829 (2011) (quoting Clearmont Prop., LLC v. Eisner, 58 A.D.3d 1052, 1055 (1994)). Thus, even if all of Plaintiff's claims proved true, Plaintiff could not prevail on this cause of action. Plaintiff does not allege that a third party interfered with the contract between Plaintiff and the USMS. This claim must be dismissed both because the Court lacks jurisdiction under the CDA and because, even a claim could be stated, no cause of action exists for interference with a

contract to which the Defendant is a party. Such a claim is for breach-of-contract, and that claim is clearly one over which this Court lacks jurisdiction.

None of the cases cited by Plaintiff counsel a different result. Cases like Qatar International Trading Co., 2008-1 B.C.A. (CCH) P33, 829 (B.C.A., Mar. 19, 2008), stand for the unremarkable proposition that the CDA does not provide jurisdiction to the Claims Court to hear tort claims that lack a "sufficient nexus" to the underlying contract dispute, but which are merely related "in some general sense" to the contractual relationship between the parties. Id. at 12 (citations omitted). In other words, "[u]nder the CDA the [Armed Services Board of Contract Appeals] lacks jurisdiction to entertain claims based upon tortious conduct which is independent of a contract between the Government and a prime contractor." Appeals of L & M Thomas Concrete Co., Ind., 98-1 B.C.A. (CCH) P 29, 560, at 146, 538 (ASBCA Feb. 2, 1998); see also, Avery v. United States, 2005 U.S. LEXIS Claims 509 at *4 (U.S. Cls. May 6, 2005) (same); Lion Raisins v. United States, 54 Fed. Cl. 427, 434 (2002) ("'Jurisdiction to resolve claims sounding in tort does not lie in this court.'") (quoting Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 404 (1998)); Krigel v. United States, 662 F.2d 741, 746-747 (Ct. Cl. 1981) (negligence outside the contractual realm does not invoke the jurisdiction of the Court of Claims); Curry v. United States, 221 Ct. Cl. 741, 746, 609 F.2d 980, 982-83 (Ct. Cl. 1979) (Court of Claims lacks jurisdiction for intentional torts); Blazavich v. United States, 29 Fed. Cl. 371, 374 (Fed. Cls. 1993) (no jurisdiction over claims sounding only in tort). Since Plaitniff's claims sound in contract, not in tort, the CDA is the remedy which Plaintiff must use. This Court therefore lacks jurisdiction to entertain the action.

22

### ii.    Federal Tort Claims Act

Defendant also asserts that, to the extent that Plaintiff's claims are not subject to the CDA, the Court lacks jurisdiction to hear Plaintiff's action because its claims are founded on contract rights.  The Court has already concluded that no jurisdiction exists in this forum.  In the interest of completeness, however, the Court will address this issue.  The question here is whether Congress waived immunity for Plaintiff's tort claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq.  See Blue Fox, 525 U.S. at 690 (finding waiver of immunity under the Tort Claims Act).  Plaintiff purports to bring his claims under the FTCA, alleging various torts in relation to Defendant's handling of his bid for the USMS contract.  Defendant asserts that all of Plaintiff's tort claims deal with interference with contractual rights, and the FTCA does not waive sovereign immunity for such claims.[5]

The FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  The FTCA establishes a number of exceptions to this waiver of liability, however.  In relevant part, the FTCA does not "apply to . . . (h) Any claim arising out of [a number of intentional torts] or interference with contract rights."  28 U.S.C. 2680(h).

As explained above, all of Plaintiff's claims concern interference with contract

---

[5]Defendant argues that the "discretionary act exception" to the FTCA's waiver of liability does not apply to this case.  No argument has been made that the exception applies.  Since another exception applies, this argument is immaterial.

rights and thus the waiver of sovereign immunity does not apply to this case.  The

FTCA is not a source of rights for the Plaintiff, and the Court may not hear such tort

claims.   The Claim raised by the Defendant that most clearly attempts to state a tort,

tortious interference with contract rights, cannot avoid this exception either.  Indeed, the

Second Circuit Court of Appeals has specifically found that a claim for tortious

interference with contractual rights "is specifically barred" by Section 2680(h).

Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 105 (2d Cir. 1981);

see also, Fondel v. Ball, 47 Empl. Prac. Dec. (CCH) P38, 310 at * 16 (S.D.N.Y. 1988)

(finding that the FTCA does not waive sovereign immunity for tortious interference with

a contract claims).

## B.    Failure to State a Claim

Defendant also contends that, even if subject matter jurisdiction existed, the

Plaintiff's complaint fails to raise a claim upon which relief could be granted.  Because

the Court has determined that subject matter jurisdiction does not exist, the Court finds

such arguments moot.  The Court declines to address that portion of the motion.  See

Rhulen, 896 F.2d at 678 (If a party moves for dismissal based on lack of subject matter

jurisdiction as well as on other grounds, "'the court should consider the Rule 12(b)(1)

challenge first since if it must dismiss the complaint for lack of subject matter

jurisdiction, the accompanying defenses and objections become moot and do not need

to be determined.'" (quoting 5 C. Wright and A. Miller, FEDERAL PRACTICE AND

PROCEDURE, § 1350, p. 148 (1969)).

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss Plaintiff's Complaint is GRANTED.  The case may not be heard in this forum.  Because the Plaintiff's claims are dismissed for lack of subject matter jurisdiction, the claims are dismissed without prejudice.  See Hernadez v. Conriv Realty Assocs., 182 F.3d 121, 123 (2d Cir. 1999) ("Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist.").


IT IS SO ORDERED

Dated: April 10, 2014


Thomas J. McAvoy
Senior U.S. District Judge